UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JASON WILLIAMS,

                Petitioner,

      v.

TIMOTHY McCARTHY,

              Respondent.

**DECISION AND ORDER**

1:19-CV-01007 EAW

---

## I.    <u>INTRODUCTION</u>

*Pro se* petitioner Jason Williams ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. 1). Petitioner is in Respondent's custody pursuant to a judgment entered against him on May 27, 2015, in Erie County Court of New York State (Franczyk, J.). (*Id.* at 1).[1] Petitioner was convicted after a jury trial of four counts of first-degree robbery (New York Penal Law ("P.L.") § 160.15(1), (2) and (4)) and one count of fourth-degree grand larceny (P.L. § 155.30(8)). (*Id.*). For the reasons below, the request for a writ of habeas corpus is denied, and the petition is dismissed.

## II.    <u>BACKGROUND</u>

### A. Indictment

On July 25, 2014, an Erie County grand jury returned a seven-count indictment, *see* Respondent's Exhibit ("Resp't Ex.") A, charging Petitioner with second-degree attempted

---

[1]    Page citations to pleadings filed by Petitioner are to the pagination automatically generated by the Court's case management and electronic filing system (CM/ECF) and located in the header of each page.

murder in violation of P.L. §§ 110.00/125.25(1) (count one); first-degree robbery (armed with a deadly weapon) in violation of P.L. § 160.15(2) (count two); first-degree robbery (caused serious physical injury) in violation of P.L. § 160.15(1) (count three); first-degree robbery (armed with a deadly weapon) under an accomplice theory in violation of P.L. §§ 20.00/160.15(2) (count four); first-degree robbery (displayed a firearm) in violation of P.L. § 160.15(4) (counts five and six); and fourth-degree grand larceny in violation of P.L. § 155.30(8) (count seven).   Counts one, two, and three involved Rosario Barone ("Barone"); count four involved William Weigold ("Weigold"); count five involved Stephanie Frank ("Frank"); and counts six and seven involved Melvin Johnson ("Johnson").

### B. *Wade/Huntley* Hearing

The parties appeared on February 10, 2015, before Erie County Court Judge Thomas P. Franczyk ("trial court") for a combined *Wade/Huntley* hearing to determine the admissibility of Johnson and Frank's identification evidence and Petitioner's custodial statements to the police.[2]   The six-photograph array shown to Johnson was introduced as People's Exhibit 3; the six-photograph array shown to Franks was introduced as People's

---

[2]   Petitioner does not challenge the trial court's ruling on the admissibility of his statements to police.   Therefore, the Court need not discuss the *Huntley* aspect of the hearing in this decision.

Exhibit 5.  (H: 15, 29-30).[3]  In both arrays, Petitioner's photograph was in the second position, i.e., the middle photograph on the top row of three photographs.  (*Id.*).

Buffalo Police Department ("BPD") Detective Thomas O'Brien ("O'Brien") testified that he went to Johnson's home at about 10:00 p.m. on May 16, 2014, and showed him a photographic array that had been prepared by another detective in his office.  (H: 9, 15).  The photographic array consisted of six black and white photographs on a gray background.  (H: 17).  All photographs depicted black males with short hair and some facial hair; all men were facing forward.  (H: 16-17).  O'Brien instructed Johnson that the person of interest may or may not be in the array, that he should not assume O'Brien knew who the perpetrator is and should not look to him for guidance, and that he should take as much time as he needed.  (H: 12-13).  At that time, O'Brien did not know what Petitioner looked like; he only knew that he was a black male.  (H: 15, 18).  O'Brien then handed the folder containing the array to Johnson on the front porch, which had "decent lighting."  (H: 10, 14, 21).  Johnson opened the folder and "instantly pointed to [Petitioner's photograph]."  (H: 14, 16).

Detective Scott Malec ("Malec") testified that on May 24, 2014, he was asked by two detectives working on Petitioner's case to show a photographic array to Frank at the police station.  (H: 29-30).  It was a "double blind" identification procedure meaning that Malec "knew nothing about the case."  (H: 32).  Only Malec and Frank were in the room

---

[3]     Citations to "H:" refer to the page numbers of the *Wade/Huntley* hearing transcript filed manually as part of Respondent's Exhibit A.  Exhibit A consists of the original court file and transcripts from Petitioner's criminal proceeding.

when he showed her the photo array; the room had several windows and "plenty of light." (H: 32, 43).  He could not remember if the light was on; he would have put on the light if necessary.  (H: 44).  Malec read to Frank the same standard instructions that O'Brien had provided to Johnson.  (H: 32-34).  Malec testified that the array consisted of six color photographs of black males; all had the same complexion, short hair, and some facial hair. (H: 30, 36-37).  They all appeared to be in their "late teens, early twenties."  (H: 37).  Malec handed the folder to Frank; when she opened it, Malec asked her if she recognized anyone and if so, which photograph.  (H: 36).  Frank replied "two," circled the photograph, and initialed next it.  (H: 36, 44).  When Malec asked from where she recognized number two, Frank said, "he took me into the hallway, made me give him oral sex, [and] robbed me of my cell phone and money out of my pockets."  (H: 36, 44).

The trial court denied the suppression motion at the conclusion of the hearing.  The trial court first made detailed findings of fact regarding the composition of the photographs in each of the arrays.  (H: 81-82).  The trial court found that the array shown to Johnson contained photos of six "black males, [who] appear to be somewhere in their twenties"; five of them, including Petitioner, are wearing black t-shirts, and number one was wearing a gray t-shirt; and their skin tones "all appear to be more or less in the same range," with number five having the darkest skin tone.  (H: 81).  The skin tone of Petitioner and numbers one, three, and six were "similar colored."  (*Id.*).  All had "varying degrees of facial hair including light mustaches," with numbers three and six having "slightly fuller" mustaches; and all had hair on their chins and framing their jawlines.  (H: 80-81).  As far as the jawline hair, number one's was "somewhat thin[]," Petitioner's was "a little bit more," number

- 4 -

three's was "a little bit more than that," number four's was "a little patchier," number five's was "a little neater," and number six's was "a little fuller." (H: 81). The trial court found that Petitioner and number one had hair "very similar in length," with Petitioner's hair being "slightly less well kempt." (*Id.*). The trial court described number three's hair as "more tightly cropped," while number four's was "somewhat thinner." (H: 81-82). Number five had a "relatively full head of hair, but less full" than numbers one and three. (H: 82). Number six had a "somewhat full head of hair which is somewhat similar to [Petitioner]'s in that it is a little bit unkempt at the top." (*Id.*).

With regard to the array shown to Frank, the trial court found that the "skin color [of all six men] appear[ed] to be pretty similar across the board," and their "facial hair [was] all pretty similar." (*Id.*). They "all" had "similar hair in terms of the length" with Defendant's hair being "a little more tousled than the others." (*Id.*).

The trial court concluded that the photo arrays did not create a substantial likelihood that Petitioner was "singled out" for identification; nor was there "any indication that the officers were kind of red-flagging [him] as the person they were looking for." (*Id.*). The trial court stated that it did not "necessarily agree with [defense] counsel's comments that [Petitioner] jumps out at you unless you knew him or had an encounter with him." (*Id.*). Accordingly, the trial court denied the motion to suppress the identifications made by Johnson and Frank. (*Id.*).

### C. Trial and Verdict

Petitioner's jury trial commenced on April 9, 2015. The prosecution called approximately two dozen witnesses. The defense did not call any witnesses. (TT: 587).[4] A summary of the relevant testimony follows.[5]

#### 1. The Incidents Involving Johnson

Johnson testified that on the afternoon of May 8, 2014, he went to his friend's apartment on the corner of Allen Street and Mariner Avenue in the City of Buffalo. (TT: 476). As soon as he opened the door, he was grabbed by four men, one of whom put a black revolver to his head. (TT: 477). Johnson knew Petitioner, as he was the nephew of one of Johnson's friends. (TT: 484). Johnson said that Petitioner was not the gunman but instead pushed him from behind at some point during the assault. (TT: 477-78).

Johnson tried to turn and run, but the men grabbed his bookbag, pulled him back, and began hitting him in the face with the gun. (TT: 476-77). The men stole his money, cell phone, and ring. (TT: 477). After ordering Johnson to lie face down and count to one hundred, the men took his bookbag and fled. (TT: 479).

On the evening of May 16, 2014, Johnson drove his girlfriend's gray minivan to his friend Antonio's house on Montclair Avenue in Buffalo. (TT: 484-85). Johnson was trying to ascertain Petitioner's whereabouts. (TT: 485). Two of Johnson's friends who had driven

---

[4]     Citations to "TT:" refer to the page numbers of the trial transcripts filed manually as part of Respondent's Exhibit A.

[5]     "In view of [Petitioner]'s conviction, [the Court] summarize[s] the facts in the light most favorable to the verdict." *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012) (per curiam) (citing *United States v. Riggi*, 541 F.3d 94, 96 (2d Cir. 2008) ("We summarize the facts in the light most favorable to the government, given the defendants' convictions.")).

over with him stayed in the minivan while he was inside speaking to Antonio. (TT: 488). At some point, there was a knock on the door; it was Petitioner. (TT: 488-99).

Johnson answered the door and confronted Petitioner about the robbery on May 6, 2014. (TT: 491). Petitioner claimed that he did not know the other men were going to rob him. (*Id.*). Johnson attacked Petitioner, who pulled out a gun. (*Id.*). Johnson's friends in the minivan ran over to help him. (*Id.*). During the ensuing struggle, the gun fell on the ground. Petitioner pulled a second gun out of his pocket. (*Id.*). Antonio grabbed Johnson and brought him inside the house where Johnson called 911 while his friends kept fighting with Petitioner over the gun. (TT: 492). One of Johnson's friends then got back into the minivan and tried to leave. (TT: 493). Petitioner ran over and held a gun to that person's head, ordered him out of the vehicle, and drove away in the minivan, leaving behind one of his guns. (TT: 493-94).

BPD Officer Donald Myers ("Myers") responded to Johnson's 911 call and spotted the gray minivan on Clay Street. (TT: 70-71). Through the car window, Myers saw that the glovebox was open, and the butt of a handgun was sticking out of the glovebox. (TT: 71, 75).

### 2. The Incident Involving Frank

In the early evening of May 13, 2014, Frank was on the corner of Grant Street and Delavan Avenue in Buffalo. (TT: 124-25). Petitioner and another black male approached her; after a brief conversation, Frank agreed to perform oral sex on Petitioner for $30. (TT: 125-26). Petitioner and the other man walked her to the hallway of 337 Grant Street, where Frank performed oral sex on Petitioner. (TT: 126-27). Petitioner then ordered her to do

the same for his companion.  (TT: 127).  At first, Frank refused because Petitioner only had paid for himself; however, she complied because she was afraid of what the two men might do.  (TT: 127-28).  Frank testified that she spit out the semen after each instance of oral sex.  (TT: 128, 140).

When she got up to leave, Petitioner held a gun about an inch away from her face, and the second man put a gun to the back of her head.  (TT: 128-29, 138).  Petitioner said, "don't scream, bitch, or I'll blow your brains out."  (TT: 129).  The men took her money and her cell phone.  (TT: 130).  Before leaving, Petitioner told Frank to count to one hundred, and said that if she left the house before counting to one hundred, he "would blow [her] brains out."  (*Id.*).

### 3.  The Incident Involving Barone and Weigold

On the evening of May 13, 2014, Barone was working as a cab driver for Liberty Cab in the City of Buffalo.  (TT: 384).  His friend, Weigold, was sitting in the front passenger seat of the cab.  (TT: 178, 384).  At around 9:50 p.m., they picked up a fare on Clay Street—two young black males.  (TT: 179-80, 385-86).  Weigold testified that the man who sat behind Rosario had a mini afro and a chipped tooth, and had a lighter complexion than the other man.  (TT: 180).  Weigold described the individual who sat behind him as darker skinned; however, the man was wearing a hoody and Weigold could not discern his face.  (TT: 180-81).

Barone and Weigold testified that shortly after they got into the cab, the men said they forgot their money and needed to go back to their house.  (TT: 182, 386).  Barone

stopped the cab; the men got out and returned momentarily to the same seats in the cab. (TT: 182, 386-87).

Barone started driving again, but the men soon said that they changed their minds and wanted to go back. (TT: 387-88). Barone reversed, drove back down the street, pulled over, and parked. (TT: 388). At that point, both men pulled out handguns and threatened to kill Barone and Weigold if they did not give them all their money. (TT: 182, 388, 390). Weigold testified that the man behind him had a .38 Special revolver; the man behind Barone pulled out a .22-caliber long nose pistol with a wooden handle. (TT: 183). Barone was not certain what kind of gun was pressed to his face; he only saw that it had a long barrel. (TT: 389).

Barone turned over his cell phone and five dollars, the only cash he had on him since the two men were his first fare of the evening. (TT: 388-90). Weigold saw the man behind Barone put the wood-handled pistol to Barone's head and say, "dude, I'm not playing with you, you know I'm going to blow your fuckin' head off, where is your money." (TT: 182).

Weigold testified that he turned over his wallet, earrings, and watch; the man behind him went through Weigold's pockets to make sure he did not have anything else. (TT: 182, 186). The man sitting behind Weigold then shot him in the back of his left shoulder. (TT: 182, 183-84).

Barone testified that when the man sitting behind him tried to get out, the door jammed; the man demanded to know whether Barone was trying to lock him in. (TT: 391). Barone explained that he would get out and open the door for him. Seconds later, Barone

- 9 -

testified that he "felt the gun go up here,"[6] so he "grabbed it and pulled it down," and he could feel that he had been shot. (TT: 391). The man told Barone to get out of the cab; Barone complied and opened the door for the man, who then ran away. (*Id.*).

Weigold testified that the man sitting behind Barone ordered Barone to exit the cab; he then looked at Barone, shot him in the right upper chest, and ran down the street. (TT: 183, 188-90). Weigold got out of the cab so the man who had shot him could exit. (TT: 182, 187-88). The man told Weigold to face the cab and not move; otherwise, he would get shot again. (TT: 183, 188). The man left, and Weigold saw that Barone was bleeding from the chest. (TT: 184-85). Weigold flagged down a passing driver and borrowed his cell phone to call 911; Weigold provided first aid to Barone until the ambulance arrived. (TT: 189-90).

After the incident, Weigold found an empty liquor bottle on the floor behind the driver's seat; he also found an Android cell phone on the middle of the seat where the men had been sitting. (TT: 191-92). BPD Detective Sal Valvo reviewed some of the numbers that had recently called the phone; one belonged to Frank. (TT: 343-45; *see also* TT: 172-74).

### 4. The Accomplice's Testimony

Davante Thompson ("Thompson"), also known as Biggie, testified that he had been friends with Petitioner for about three or four years. (TT: 214-16). Petitioner had a chipped tooth visible when facing him on the left side. (TT: 253). Thompson admitted he was the

---

[6]     It is not clear from the record where Barone was indicating when said he felt the "gun go up here."

man with Petitioner during the robberies of Frank, Barone, and Weigold. (TT: 217-29). Thompson confirmed that he and Petitioner stole Frank's money and cell phone at gun point. (TT: 218-19). During that incident, Thompson had a small, pearl-handled revolver; Petitioner had a wood-handled pistol. (TT: 219).

Thompson said that after robbing Frank, they went to a liquor store and bought a bottle of brandy. (TT: 220). They then went to Clay Street, and Petitioner went into the house where his "baby momma" (i.e., Jasmin Castro) lived. (TT: 220-21). When Petitioner returned, he and Thompson went to an abandoned house a couple doors down the street and drank liquor on the porch. (TT: 221).

Thompson said that Petitioner eventually called a cab using Frank's cell phone; it was dark out by that time. (TT: 222). When the cab arrived, Thompson got in on the passenger's side; Petitioner sat behind the driver. (TT: 223). Once the cab started moving, Thompson and Petitioner pulled out their guns and demanded that the men in the front seat turn over their money. (TT: 224). The driver only had five dollars on him; he showed Thompson and Petitioner the clipboard indicating that he had picked up just one fare that night—the two of them. (TT: 226).

Thompson admitted that he shot Weigold during the robbery. (TT: 226). Thompson was already out of the cab when he heard a second gunshot followed by Barone saying, "I'm shot." (TT: 227-28). He turned around and saw Barone lying on the ground and Petitioner getting out of the driver's seat. (TT: 228). As Thompson and Petitioner were leaving the scene, Thompson gave Petitioner his gun. (TT: 228-29). Thompson testified that he dropped his cell phone in the cab as he was getting out. (TT: 237). He identified

the wood-handled handgun retrieved from the glovebox of Johnson's girlfriend's gray minivan as one of the guns used during the robberies of Barone, Weigold, and Frank. (TT: 235-37).  He also identified the liquor bottle retrieved from the floor of the cab. (TT: 234-35).

Thompson admitted he was testifying pursuant to a cooperation agreement in connection with his guilty plea to three counts of first-degree attempted robbery based on the incidents involving Frank, Barone, and Weigold. (TT: 229-30).  He acknowledged that he faced up to fifteen years' imprisonment or as little as local jail time or probation. (TT: 231).  He testified that no one had made him any promises regarding his sentence. (TT: 231-32).

### 5.  Corroborating Testimony and Evidence

Jasmin Castro ("Castro") testified that she had a son with Petitioner. (TT: 299-300).  Petitioner told her that he and "Biggie" had committed a robbery on Clay Street. (TT: 300, 313).  Petitioner admitted to Castro that during the robbery, he had shot the cab driver because he was "holding him back." (TT: 301).  Petitioner said that "Biggie" shot the other man in the cab. (*Id.*).  Castro testified that Biggie's gun was black with a white handle and that Petitioner's gun was black. (TT: 309).

Forensic biologist Cara Fisher compared Thompson's known DNA profile with the profile on the semen samples recovered at 337 Grant Street and determined that he was the major contributor of the DNA. (TT: 521-24).  Fisher also compared Petitioner's known DNA profile with the DNA profile on the handgun found in the minivan and determined that Petitioner was the major contributor of the DNA. (TT: 525-26).  Lastly, Fisher

compared Petitioner's DNA profile with the DNA profile on the liquor bottle recovered from Barone's cab and found that Petitioner could not be excluded as a contributor to the profile.  (TT: 526-27).  Fisher opined that the odds of an unrelated individual being a contributor to the DNA profile on the liquor bottle was one in 2,311.  (TT: 527-29).

### 6.  Verdict

The jury returned a verdict acquitting Petitioner of second-degree attempted murder with regard to Barone (count one) and first-degree robbery with regard to Johnson (count six).  (TT: 721-22).  The jury convicted Petitioner of the remaining counts in the indictment. (*Id.*).

### D.  The Motion to Set Aside the Verdict and the Sentence

On May 15, 2015, Petitioner filed an unpaginated *pro se* motion to set aside the verdict pursuant to C.P.L. § 330.30 ("330 motion").  *See* Resp't Ex. A.  At the sentencing hearing on May 27, 2015, the trial court heard oral argument on the 330 motion and summarily denied it.  (ST: 3-12).[7]  The trial court imposed concurrent determinate sentences in the aggregate amount of fifteen years' imprisonment plus five years' post-release supervision for the four first-degree robbery convictions.  (ST: 26-27).  The trial court also imposed an indeterminate term of one and one-third to four years' imprisonment on the fourth-degree grand larceny conviction, to be served consecutively to the determinate sentences on the robbery convictions.  (ST: 27).

---

[7]      Citations to "ST:" refer to the pages of the transcript of the May 27, 2015 sentencing hearing, included as part of Respondent's Exhibit A.

### E.  Post-Judgment Proceedings

Represented by new counsel, Petitioner pursued a direct appeal of his conviction.  *See* Resp't Ex. B.  On May 5, 2017, the judgment was unanimously affirmed by the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division").  *People v. Williams*, 150 A.D.3d 1684 (4th Dep't 2017).  Petitioner sought leave to appeal.  *See* Resp't Ex. C.  The New York Court of Appeals denied leave to appeal on July 20, 2017, and denied reconsideration on September 28, 2017.  *People v. Williams*, 29 N.Y.3d 1095, *reconsideration denied*, 30 N.Y.3d 954 (2017).

While his direct appeal was pending, Petitioner filed a *pro se* motion to vacate the conviction pursuant to C.P.L. § 440.10 ("440 motion") on July 12, 2016, in Erie County Court (Franczyk, J.) ("440 court")  *See* Resp't Ex. D.  The prosecution opposed the motion, and the 440 court denied relief in a decision and order dated January 12, 2017 ("440 order").  *See* Resp't Ex. D.

On May 21, 2018, Petitioner filed a *pro se* petition for a writ of error *coram nobis* ("*coram nobis* petition") in the Appellate Division, and the prosecution opposed it.  *See* Resp't Ex E.  The Appellate Division summarily denied the petition on November 9, 2018.  *People v. Williams*, 166 A.D.3d 1544 (4th Dep't 2018).  Petitioner sought leave to appeal to the New York Court of Appeals, which was denied on February 28, 2019.  *People v. Williams*, 32 N.Y.3d 1211 (2019).

## F.  Federal Habeas Proceeding

Petitioner filed the petition on June 21, 2019.[8]  (Dkt. 1 at 9).  The petition asserts the following claims for relief:  Petitioner was denied the right to conflict-free representation (*id.* at 6 ¶ 22(A)) ("claim one"); defense counsel conducted a poor alibi investigation (*id.*) ("claim two"); defense counsel failed to preserve issues for appeal (*id.*) ("claim three"); the conviction was against the weight of the evidence (*id.* at 7 ¶ 22(B)) ("claim four"); the prosecution constructively amended the indictment by adding accomplice liability to the theory of its case at trial (*id.*) ("claim five"); the denial of the 330 motion without a hearing violated due process (*id.*) ("claim six"); the identification evidence was the product of unduly suggestive photographic arrays (*id.*) ("claim seven"); the sentence was unduly harsh and severe (*id.*) ("claim eight"); the prosecutor failed to inform the jury that he had a conflict of interest due to his previous prosecution of Petitioner (*id.* ¶ 22(C)) ("claim nine"); and the prosecutor knowingly presented false testimony that was contradicted by physical and DNA evidence (*id.*) ("claim ten").

---

[8]     Because Petitioner is unrepresented and incarcerated, he is entitled to the benefit of the prison mailbox rule. *See Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001) (extending "prison mailbox" rule to habeas proceedings and holding that a *pro se* and incarcerated litigant's petition is filed at the time he delivers it to the prison authorities for mailing to the court clerk).  There is no indication when Petitioner handed over the petition for mailing.  Absent evidence to the contrary, the Court assumes that Petitioner gave his petition to prison officials for mailing on the date he signed it.  *See*, *e.g.*, *Corrigan v. Barbery*, 371 F. Supp. 2d 325, 328 n.4 (W.D.N.Y. 2005) ("As there is nothing in the docket to indicate when Corrigan turned his papers over to authorities for mailing, the Court will give Corrigan the benefit of the doubt and utilize the date on which Corrigan signed his petition. . . .").

Respondent filed a response (Dkt. 4) and memorandum of law (Dkt. 5).  Respondent manually filed the state court records and transcripts.  *See* Resp't Ex. A.  Respondent argues that the petition is untimely and is, in any event, meritless.  Petitioner filed a reply.  (Dkt. 7).  At the Court's request, Respondent filed copies of the photographic arrays, which were missing from the manually-filed documents.  (Dkt. 17).

### III.   <u>TIMELINESS</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") contains a one-year statute of limitations which begins to run upon the latest of four events.  *See* 28 U.S.C. § 2244(d)(1)(A)-(D). AEDPA provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation."  *Id.* § 2244(d)(2).

The Second Circuit applies the prison mailbox rule to determine the date on which a state-court application for post-conviction or other collateral review is "properly filed" for purposes of § 2244(d)(2).  *Fernandez v. Artuz*, 402 F.3d 111, 116 (2d Cir. 2005); *see also id.* at 114 (petitioner's state *coram nobis* motion was "properly filed" on the date he delivered it to prison authorities for mailing).  "A state court application or motion for collateral relief is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures."  *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000); *see also Carey v. Saffold*, 536 U.S. 214, 217, 221 (2002) (approving Second Circuit's definition of "pending").  "[S]tatutory tolling for the purposes of AEDPA ends with the 'filing' of the state court's

final order," *Saunders v. Senkowski*, 587 F.3d 543, 549 (2d Cir. 2009), not the date on which the petitioner "received notice of the state court's order," *id.*

In most § 2254 cases, including this one, the start-date for the limitations period is found in § 2244(d)(1)(A), "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]" *Id.* For prisoners in New York State, the conviction becomes final ninety days after leave to appeal to the New York Court of Appeals is denied, because defendants have ninety days in which to file a request for *certiorari* with the United States Supreme Court. *See Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001).

Here, the New York Court of Appeals first denied Petitioner's request for leave to appeal on July 20, 2017, and upon reconsideration, denied his request for leave to appeal again on September 28, 2017. Using the latter of these two dates to calculate the time in which Petitioner could petition the United States Supreme Court for *certiorari*, his conviction became final ninety days later on December 27, 2017. *See Ebrahim v. LeConey*, No. 10-CV-6397 MAT, 2012 WL 6155655, at *10 (W.D.N.Y. Dec. 11, 2012) (finding that the petitioner's conviction became final, and the one-year federal habeas limitations period commenced, ninety days after the New York Court of Appeals denied, upon reconsideration, his request for leave to appeal) (collecting cases).

Petitioner had one year from December 27, 2017, or until December 27, 2018, to commence this § 2254 proceeding. Petitioner filed his petition on June 21, 2019, almost six months after the limitations period expired. Absent sufficient statutory tolling under § 2244(d)(2), it is untimely under § 2244(d)(1)(A).

Petitioner is entitled to statutory tolling for the pendency of the *coram nobis* petition. As of May 21, 2018, the date it was filed, 145 days had elapsed on the one-year period. Respondent argues that the *coram nobis* petition ceased to be pending on November 9, 2018, the date it was denied by the Appellate Division.  (Dkt. 5 at 9-10).  Respondent relies on *Hizbullahankhamon v. Walker*, 255 F.3d 65 (2d Cir. 2001), in which the Second Circuit found that the petitioner's *coram nobis* petitions ceased to be pending on the respective dates they were denied by the Appellate Division, and that the limitations period was not tolled during the intervals between those denials and the dates on which the Court of Appeals dismissed the petitioner's applications for leave to appeal those denials.  *Id.* at 71.

At the time *Hizbullahankhamon* was decided, "New York law prohibited the appeal of *coram nobis* petitions to the Court of Appeals."  *Saunders v. Senkowski*, 587 F.3d 543, 548 n.1 (2d Cir. 2009).  However, "[o]n November 1, 2002, such appeals were authorized by new legislation."  *Id.* (citing N.Y. Crim. Proc. Law § 450.90(1)); *see also Clemente v. Lee*, 72 F.4th 466, 477 (2d Cir. 2023) ("After November 1, 2002, [C.P.L.] § 450.90, as amended (*see* 2002 N.Y. Sess. Laws ch. 498 (amending § 450.90)), affords petitioners the opportunity to seek leave to appeal from the Appellate Division's denial of a petition for writ of error *coram nobis* alleging wrongful deprivation of appellate counsel to the Court of Appeals." (citing *People v. Jones*, 100 N.Y.2d 606, 607 (2003)).  As Petitioner argues in his reply, *Hizbullahankhamon* is no longer good authority for the proposition cited by Respondent.  (Dkt. 7 at 6).

Petitioner's *coram nobis* petition ceased to be pending on February 28, 2019, when the New York Court of Appeals denied his application for leave to appeal.  *See Clemente*,

- 18 -

72 F.4th at 477. The statute of limitations ran for another 113 days from February 28, 2019, until June 21, 2019, the date the petition was filed. At the time of filing, only 258 (145 + 113) days had elapsed on the one-year limitations period. Therefore, the petition is timely under § 2244(d)(1)(A).

## IV.   <u>STANDARD OF REVIEW</u>

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by . . . AEDPA[]." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Under § 2254(d), a federal court "shall not . . . grant[ ]" an application for a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim— (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*, § 2254(d). In addition, a state court's factual findings are entitled to a presumption of correctness which only may be rebutted by "clear and convincing evidence." *Id.*, § 2254(e)(1). AEDPA articulates a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted).

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington*, 562 U.S. at 98. "[W]hen it is unclear whether AEDPA deference applies," the Supreme Court has

stated that courts may "deny writs of habeas corpus under § 2254 by engaging in *de novo* review because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## V.   <u>DISCUSSION</u>

### A.   **Ineffective Assistance of Counsel (Claims One, Two, and Three)**

#### 1.   **Background**

Petitioner asserts that he was denied his Sixth Amendment right to the effective assistance of counsel because (1) his attorney had conflicts of interest; (2) did not call alibi witness Aliya Tompkins ("Tompkins"); (3) failed to conduct a sufficient investigation into other alibi witnesses; (4) and failed to preserve several issues which would have resulted in reversal of his conviction on appeal.  (Dkt. 1 at 6, ¶ 22(A)).  Petitioner raised the third allegation in the 330 motion; the first allegation in the 330 motion, on direct appeal, and in the 440 motion; and the second and fourth allegations in the 440 motion.  *See* 330 Motion, Resp't Ex. A; Pet'r App. Br. at 29-30, Resp't Ex. B; 440 Motion at pgs. 1(B) - 3(B), Resp't Ex. D.

#### 2.   **Exhaustion and Procedural Default**

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also* 28 U.S.C. § 2254(b)(1)(A).  "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one

full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845.

There is no documentation in the state court records suggesting that Petitioner sought leave to appeal to the Appellate Division after the 440 court denied the 440 motion. A "complete round of the . . . established appellate review process," *O'Sullivan*, 526 U.S. at 845, for a C.P.L. § 440.10 motion requires seeking a certificate from the Appellate Division granting leave to appeal. *See* N.Y. Crim. Proc. Law §§ 450.15(1), 460.15. Once the Appellate Division denies leave to appeal the denial of a C.P.L. § 440.10 motion, the petitioner has "reached 'the end of the road within the state system.'" *Klein v. Harris*, 667 F.2d 274, 284 (2d Cir. 1981) (quoting *United States ex rel. Graham v. Mancusi*, 457 F.2d 463, 467 (2d Cir. 1972)); *see also id.* at 283-84 ("Under [C.P.L. §] 450.90, no appeal to the New York Court of Appeals lies from an order denying a motion for leave to appeal to the Appellate Division."). Therefore, "claims raised in . . . a [C.P.L. § 440.10] motion are considered exhausted for federal habeas purposes once the Appellate Division has denied leave to appeal." *Safran v. New York*, No. 1:22-CV-3177 (NRM), 2023 WL 3306932, at *2 (E.D.N.Y. May 6, 2023) (collecting cases).

It appears that Petitioner did not complete one round of New York State's established review process for motions to vacate under C.P.L. § 440.10 and therefore has not fulfilled the exhaustion requirement as to the claims presented in his 440 motion. *See*, *e.g.*, *Reyes v. Phillips*, 02-cv-7319, 2005 WL 475544, at *5 (S.D.N.Y. Mar. 1, 2005) (holding that the petitioner's "[f]ailure to seek leave to appeal the denial of a [C.P.L.] §

440.10 motion to the Appellate Division constitutes failure to exhaust the claims raised in that motion" (citing *Pesina v. Johnson*, 913 F.2d 53 (2d Cir. 1990) (per curiam)).

The Court need not devote further time to assessing whether the various claims raised in the 440 motion and reasserted in the petition are fully unexhausted or should be deemed exhausted but procedurally defaulted. When the underlying claims are obviously without merit, a habeas court may bypass procedural questions to reach the merits of a habeas petition. *See Lambrix v. Singletary*, 520 U.S. 518, 523 (1997). Furthermore, AEDPA now gives district courts the authority to deny a petition containing unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2). The rationale behind § 2254(b)(2) has been described as "spar[ing] state courts from needlessly wasting their judicial resources on addressing meritless claims solely for the sake of exhaustion." *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.11 (E.D.N.Y. 2010).

In this Circuit, the various formulations for the proper standard to be used when relying on § 2254(b)(2) share "the common thread of disposing of unexhausted claims that are unquestionably meritless." *Id.* (collecting cases); *see also Barnes v. Uhler*, No. 6:18-CV-06428 EAW, 2021 WL 5176667, at *14 (W.D.N.Y. Nov. 8, 2021) (relying on the "unquestionably meritless" standard to dismiss unexhausted claims). Because all of the petition's claims are readily denied on the merits, and because the potentially unexhausted claims in particular are "unquestionably meritless," the Court will exercise its discretion to bypass the issues of exhaustion and procedural default.

### 3.  Merits

To establish that his attorney was not functioning as the effective counsel guaranteed by the Sixth Amendment, Petitioner must satisfy *Strickland*'s two-pronged test. First, Petitioner must show that his "attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The object of an ineffectiveness claim is not to grade counsel's performance."  *Strickland*, 466 U.S. at 697.  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam).

Second, Petitioner must show that counsel's "deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.  Prejudice "is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."  *Id.* at 696.  "[T]he likelihood of a different result in the absence of the alleged deficiencies in representation 'must be substantial, not just conceivable.'"  *Garner v. Lee*, 908 F.3d 845, 849 (2d Cir. 2018) (quoting *Harrington*, 562 U.S. at 112).  The Court considers defense counsel's alleged errors in turn below.

### a.  Conflicts of Interest

The only specific conflict identified by Petitioner in state court was that defense counsel took an adverse position to him at the 330 motion with regard to the viability of an alibi defense.  *See* Pet'r App. Br. at 29-31 (citing ST: 2-3), Resp't Ex. B.  After the trial

court asked if he wished to take any position as to the *pro se* 330 motion, defense counsel responded as follows:

> As he indicated in his *pro se* motion, he and I had discussed bringing a 330 motion and based on all of the information based on the case, the trial, I still feel that the 330 motion was not an appropriate avenue to pursue. I believe all of our issues can be adequately addressed on appeal[;] however, my client feels differently and I, at this point, don't see basically eye-to-eye on that issue. As far as an alibi defense that we had discussed, I had a private investigator based on all of the information that I had at the time of the trial and since[] I did not think we could support that defense and obviously did not use it at trial.

(ST: 2-3). The witnesses listed in the 330 motion were Tompkins, Ramona Hunter ("Hunter"), Ciaphis Hawkins ("Ciaphis"), Tara Hawkins ("Tara"), Antonio Favors ("Favors"), and Castro. Defense counsel noted that two of the witnesses were new to him. (ST: 3). Defense counsel explained that the defense investigator had been out looking for and talking to three of the witnesses, and Castro actually testified at trial for the prosecution. (*Id.*). It is unclear from the transcript which witnesses were new and which had been investigated by the defense.

The Appellate Division rejected Petitioner's contention that the trial court erred in denying his *pro se* 330 motion without conducting a hearing or assigning new counsel. *Williams*, 150 A.D.3d at 1685. As an initial matter, the Appellate Division found that the motion was improperly characterized as one brought pursuant C.P.L. § 330.30(3) based on newly discovered alibi evidence. *Id.* Instead, it fell under C.P.L. § 330.30(1) because Petitioner "alleged that he was denied effective assistance of counsel because he and his attorney 'didn't agree upon a[n] alibi [defense]' and there were people in defendant's notice

of alibi [attached to the 330 motion] 'who weren't even contacted by [counsel].'" *Id.* (alterations in original; quotation to record omitted in original).

The Appellate Division further held that "even assuming, *arguendo*, . . . defense counsel took an adverse position on the motion, . . . reversal is not required based on the court's failure to assign new counsel because the comments of defense counsel had no impact on the fact that defendant's motion was inappropriate under CPL [§] 330.30." *Id.* (citing *People v. McClassling*, 143 A.D.3d 528, 529 (1st Dep't 2016) (stating that substitution of counsel was unwarranted because "[a] new attorney would not have been able to overcome the rule that a CPL [§] 330.30(1) motion is limited to matters appearing on the record"); *People v. Collins*, 129 A.D.3d 1676, 1677 (4th Dep't 2015) (finding that reversal of conviction was unwarranted even assuming that counsel took an adverse position to defendant because counsel's statements at sentencing did not "contribute to any rulings against defendant")). The Supreme Court has "repeatedly held that a state court's interpretation state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam).

Since neither subsection (1) nor subsection (3) of C.P.L. § 330.30 was applicable, the trial court had no choice but to deny the 330 motion without a hearing. Petitioner accordingly cannot demonstrate that the outcome of the 330 motion was affected in any way by defense counsel's statements regarding his purported alibi defense or the propriety of his 330 motion. This means that Petitioner cannot demonstrate prejudice under *Strickland*.

In the subsequent 440 motion, Petitioner asserted, without providing any specifics, that counsel was not "conflict free."  As the 440 court found, Petitioner did "not articulate[] in any coherent manner how defense counsel failed to provide conflict-free representation." 440 Order at 8, Resp't Ex. D.  Instead, Petitioner alleged no more than his "retrospective[ ] . . . disagreement with the strategies and tactics of defense counsel, a skillful trial lawyer, in the handling of this case."  *Id.* at 7.

It is well settled that "a defendant cannot establish an actual conflict of interest merely by 'expressing dissatisfaction with [the] attorney's performance.'"  *United States v. John Doe No. 1*, 272 F.3d 116, 126 (2d Cir. 2001) (alteration in original) (quoting *United States v. Moree*, 220 F.3d 65, 71 (2d Cir. 2000)); *see also United States v. Jones*, 482 F.3d 60, 75 (2d Cir. 2006) ("As the only basis asserted by Jones for his claim that his attorneys had a conflict of interest is that he and they disagreed as to tactics, he has not shown an actual conflict of interest.").  Given the lack of any non-speculative factual allegations to support the claimed conflicts of interest, the 440 court correctly rejected Petitioner's claim.

### b.  Failure to Investigate and Call Alibi Witnesses

Petitioner contends that defense counsel failed to contact any of his alibi witnesses, even though Petitioner had supplied him with a list of names.  Petitioner attached to the 330 motion a handwritten notice of alibi listing Tompkins, Hunter, Ciaphis, Tara, Favors, and Castro.  He asserted that he was at 2460 Baseline Road, Apartment 5, in Grand Island when the incidents involving Frank, Barone, and Weigold occurred.  He indicated that Ciaphis and Tara lived at that address but provided no specifics about their proposed testimony.  He also asserted that he was at 456 Berkshire Street at a baby's birthday party

when the robbery of Johnson occurred; however, he did not state whether it was the May 8 or May 16 incident.  He listed Hunter's address as 456 Berkshire Street but did not provide any specifics about her proposed testimony.  He likewise provided no information regarding Tompkins or Favors apart from their addresses.  Based on the address given for Favors, it appears that he was friend who Johnson visited on May 16, 2014.  (TT: 484-85).  Lastly, as noted above, Castro testified for the prosecution.

In the 440 motion, Petitioner alleged that Tompkins sent him an "affidavit," which he stated was attached as "Exhibit (A)" to the 440 motion.[9]  *Id.*  In that statement, Tompkins asserted that on May 8, 2014, she and Petitioner were together from about 4:00 p.m. to 6:00 p.m., at Petitioner's mother's house.  On May 16, 2014, Tompkins stated that she and Petitioner were "together all day."  She went over to Petitioner's and had breakfast.  At 3:00 p.m., Petitioner's mother dropped her and Petitioner off at 456 Berkshire Street to attend a birthday party for their mutual cousin; the party started at 5:00 p.m. and ended at 10:30 p.m.  Therefore, Tompkins asserted, Petitioner could not have committed any crimes on May 16, 2014.

"The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess."  *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam).  Thus, "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional

---

[9]     There are no attachments to the 440 motion as submitted by Respondent in the Appendix of Exhibits.  The copy of the *coram nobis* motion submitted as part of Respondent's Exhibit E does include a copy of Tompkins's statement.

representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000).  A petitioner "does not show that he was prejudiced by trial counsel's failure to call witnesses merely by asserting that they might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result." *Carr v. Senkowski*, No. 01-CV-689, 2007 WL 3124624, at *20 (W.D.N.Y. Oct. 23, 2007) (citing, *inter alia*, *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). "[I]n order for the [petitioner] to demonstrate the requisite *Strickland* prejudice, the [petitioner] must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Id.* at *22 (citing *Alexander*, 775 F.2d at 602).

Petitioner has failed to demonstrate that Hunter, Ciaphis, Tara, Favors, and Castro had any relevant, helpful testimony to give.  Nor has he shown that any of these individuals would have been willing to testify for the defense.  "Federal courts 'have no obligation to entertain pure speculation and conjecture.'" *Scott v. Racette*, No. 1:15-CV-00043-MAT, 2018 WL 451825, at *15 (W.D.N.Y. Jan. 17, 2018) (quoting *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011)); *see also Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support").  The speculative nature of Petitioner's allegations, standing alone, is a sufficient basis for rejecting the ineffectiveness claim based on defense counsel's failure to call these purported alibi witnesses.  *See Scott*, 2018 WL 451825, at *15 (rejecting the habeas petitioner's "claims of pervasive misconduct by multiple law enforcement agencies,

amounting to no less than a conspiracy to unjustly incarcerate him," because they were "based upon rank speculation with no record support") (collecting cases).

As far as Tompkins, Petitioner cannot demonstrate that he was prejudiced by defense counsel's failure to call Tompkins in regard to the May 8, 2014 robbery involving Johnson. As the 440 court found, defense counsel secured an acquittal on this count. *See* 440 Order at 8, Resp't Ex. D. Therefore, "[n]o prejudice resulted from counsel's decision not to present an alibi defense." *Id.*

The 440 court did not address the remainder of Tompkins's statement regarding Petitioner's whereabouts on May 16, 2014, the date Johnson's girlfriend's minivan was stolen. As an initial matter, although a notary public's stamp appears on the statement, Tompkins did not swear to it under penalty of perjury before the notary public. Further, it was not corroborated by any other evidence, such as a statement from someone else who attended the May 16, 2014 birthday party, tending to show that Petitioner was, in fact at that party. *See*, *e.g.*, *Atkins v. Chappius*, No. 1:13-CV-00956-CJS, 2020 WL 6264452, at *14 (W.D.N.Y. Oct. 23, 2020) (finding that alibi witness's letter lacked any indicia of reliability where it was notarized but unsworn and was uncorroborated by any other evidence").

Moreover, it appears that Tompkins was in a romantic relationship with Petitioner[10] or was a family member.[11]   Either way, the fact that they had a close relationship undermines the credibility and persuasiveness of her alibi testimony.  "[C]ourts generally hold alibi affidavits from relatives insufficiently credible to compel a reasonable juror to acquit." *Dunbar v. Griffin*, No. 11-CV-5858, 2022 WL 36366, at *6 (E.D.N.Y. Jan. 4, 2022) (collecting cases).  "This is due to concerns that these types of witnesses '[o]bviously . . . have reason to lie to protect [the] petitioner.'" *Id.* (alteration and ellipsis in original) (quoting *Garcia v. Portuondo*, 334 F. Supp. 2d 446, 456 (S.D.N.Y. 2004)).

The Court finds that there is no reasonable possibility of a different outcome had Tompkins testified as outlined in her unsworn and uncorroborated statement.  There was overwhelming evidence linking Petitioner to the stolen minivan, including that it was found parked on the street where the mother of his child lived, and the gun used by Petitioner during the charged crimes was in plain view in the open glovebox.  Petitioner therefore cannot demonstrate that he was prejudiced by defense counsel's failure to call Tompkins.  Petitioner's inability to show prejudice is fatal to this ineffectiveness claim, and the Court need not consider whether defense counsel performed deficiently in declining to call Tompkins in support of an alibi defense.

---

[10]     After he was taken into custody, Petitioner initially told the police that he did not remember his whereabouts on "May 16, 2014[,] at 2018 [sic] hours," because he "smoke[s] a lot of weed."  People's Notice to Defendant of Intention to Offer Evidence at Trial Under C.P.L. §§ 710.30 and 700.70, Resp't Ex. A.  He then said, "I remember now, I was with my girlfriend Aliya Tompkins."  *Id.*

[11]     Tompkins stated that "[her] baby cousin . . . is also [Petitioner]'s cousin."  Unsworn Statement of Aliya Tompkins, Resp't Ex. D.

### c.  Failure to Preserve Issues for Appeal

Petitioner has not specified which issues defense counsel erroneously failed to preserve for appellate review.  A "claim of ineffective assistance must contain specific factual contentions regarding how counsel was ineffective." *Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 354-55 (N.D.N.Y. 2013) (collecting cases).  "The absence of such allegations is fatal to an ineffective assistance claim on habeas." *Hall v. Phillips*, No. 1:04-CV-1514(NGG)(VVP), 2007 WL 2156656, at *13 (E.D.N.Y. July 25, 2007).

In any event, the claim is meritless because Petitioner cannot demonstrate prejudice. Although the Appellate Division found Petitioner's challenge to the sufficiency of the evidence supporting the robbery convictions unpreserved, it nevertheless considered the claim on the merits and rejected it. *Williams*, 158 A.D.3d at 1684-85 ("The accomplice's testimony was corroborated by, *inter alia*, the testimony of other witnesses, certain physical and DNA evidence, and the testimony of his girlfriend that defendant told her that he committed a robbery with the accomplice.").  Notably, the Appellate Division also rejected the contention that defense counsel was ineffective for failing to preserve the legal sufficiency challenge for appellate review.  *See id.* at 1685 ("A defendant is not denied effective assistance of trial counsel merely because counsel does not make a motion or argument that has little or no chance of success.").

Although the Appellate Division found that one argument in support of Petitioner's challenge to the suggestiveness of the identification procedures was unpreserved, the Appellate Division considered that argument on the merits and rejected it, as discussed below in connection with claim seven.

Because Petitioner obtained appellate review of the unpreserved issues notwithstanding the lack of preservation, he cannot demonstrate that he was prejudiced by defense counsel's failure to comply with the contemporaneous objection rule. Petitioner's inability to show prejudice is fatal to his ineffectiveness claim, and the Court need not consider the performance prong. *See Strickland*, 466 U.S. at 697.

For the foregoing reasons, claims one, two, and three alleging ineffective assistance of counsel are meritless and do not provide a basis for habeas relief.

## B. Verdict Against the Weight of the Evidence (Claim Four)

### 1. Background

Petitioner reasserts his claim, raised on direct appeal, that the verdict was against the weight of the evidence. (Dkt. 1 at 7 ¶ 22(B)); *see also* Pet'r App. Br. at 23-24 (arguing that based on all the credible evidence, a different finding—that Petitioner "was falsely implicated" by Thompson "solely for sentence reductions," and that Petitioner "was not involved in any of the robberies—would not have been unreasonable"), Resp't Ex. B. The Appellate Division rejected the claim. *Williams*, 150 A.D.3d at 1685 ("Viewing the evidence in light of the elements of the crimes as charged to the jury, we further conclude that the verdict is not against the weight of the evidence.").

### 2. Merits

"A challenge to a verdict based on the weight of the evidence differs from one based on the sufficiency of the evidence." *Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 332 (W.D.N.Y. 2011). A "weight of the evidence" claim is grounded in a state statutory provision, C.P.L. § 470.15(5), *see People v. Bleakley*, 69 N.Y.2d 490, 495 (1987), whereas

a sufficiency of the evidence claim is based on due process principles, *see Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (stating that an "essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense").

It is well settled that "federal habeas corpus relief does not lie for errors of state law[.]" *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). The Second Circuit has recognized that "the argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus." *McKinnon v. Sup't, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (collecting cases). Courts in this Circuit consistently have dismissed, as not cognizable, claims by habeas petitioners asserting their verdicts were against the weight of the evidence. *See id.* Because Petitioner's challenge to the weight of the evidence supporting his conviction presents nothing more than an issue of state statutory law, claim four is dismissed as not cognizable on federal habeas review.

The Court is mindful that where, as here, a habeas petitioner is proceeding *pro se* and "lack[s] expertise," it "should review [his] habeas petition[ ] with a lenient eye." *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983). Even construing the petition to raise a claim that the evidence was legally insufficient as a matter of due process, the Court finds that habeas relief is not warranted. The Court notes that on direct appeal, Petitioner raised an argument citing the due process clause and arguing that the evidence was legally insufficient under C.P.L. § 60.22 to corroborate accomplice Thompson's testimony. *See*

Pet'r App. Br. at 16-22, Resp't Ex. B.  C.P.L. § 60.22 provides in pertinent part that "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense."  N.Y. Crim. Proc. Law § 60.22(1).

However, "there is no federal constitutional rule requiring the corroboration of accomplice testimony." *Martinez v. Walker*, 380 F. Supp. 2d 179, 183 (W.D.N.Y. 2005) (citing *Caminetti v. United States*, 242 U.S. 470, 495 (1917) ("[T]here is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them.")). To the contrary, "[a] conviction may be sustained on the basis of the testimony of a single accomplice, provided that testimony is 'not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'"  *Id.* at 183-84 (quoting *United States v. Gordon*, 987 F.2d 902, 906 (2d Cir. 1993)).  "Any lack of corroboration goes to the weight of the evidence, not to its sufficiency, and a challenge to the weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal." *Gordon*, 987 F.2d at 906.  Because Petitioner's sufficiency of the evidence claim is based solely on New York State's accomplice corroboration requirement, it does not constitute a violation of a federal constitutional right.  Accordingly, it does not provide a basis for habeas relief.

### C.  Constructive Amendment of the Indictment (Claim Five)

#### 1.  Background

Petitioner argues that the prosecution, realizing there was not enough evidence to convict him as a principal, improperly added accomplice liability to their theory of the case at the close of the proof.  (Dkt. 1 at 7 ¶ 22(B)).  Petitioner is referring to the trial court's

issuance of a jury instruction on accomplice liability under P.L. § 20.00.  (*See* TT: 680-83).  According to Petitioner, this constructively amended the indictment and resulted in a violation of his due process right to a fundamentally fair trial.  Petitioner raised this claim in his 440 motion.  *See* 440 Motion at 2(B), Resp't Ex. D.

### 2.  Merits

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018).  To show an unconstitutional amendment occurred, a defendant "must demonstrate that either the proof at trial or the trial court's jury instructions so altered an *essential element* of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment."  *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (emphasis added).

However, "[t]he theory of liability is not a material or essential element of the offense charged upon which the jury will determine guilt, and there is no distinction under New York law between criminal liability as a principal or as an accomplice."  *Sell v. Conway*, No. 6:10-CV-6182 MAT, 2014 WL 2708381, at *18 (W.D.N.Y. June 16, 2014) (citing *People v. Rivera*, 84 N.Y.2d 766, 770 (1995); N.Y. Penal Law § 20.00); *see also People v. Duncan*, 46 N.Y.2d 74, 79-80 (1978) (holding that whether a defendant is convicted as a principal or an accomplice "has no bearing upon the theory of the prosecution").

"Since there is no legal distinction between liability as a principal or criminal culpability as an accomplice, it cannot be said that Petitioner failed to receive adequate notice of his potential liability as an accomplice under the indictment."  *Sell*, 2014 WL 2708381, at *18 (rejecting habeas petitioner's claim that the prosecution unlawfully amended the indictment to include a theory of accomplice liability because it did not present a cognizable federal constitutional question (citing *Chandler v. Moscicki*, 253 F. Supp. 2d 478, 486-88 (W.D.N.Y. 2003) (finding that the "trial court correctly found that the theory of prosecution did not unconstitutionally change the basis for Chandler's culpability as an accomplice rather than as a principal")).  Therefore, Petitioner has not stated a due process violation, and claim five does not afford a basis for habeas relief.

### D.  Denial of the 330 Motion Without a Hearing (Claim Six)

#### 1.  Background

Petitioner asserts that the trial court improperly denied his 330 motion without holding a hearing and assigning new counsel.  (Dkt. 1 at 7, ¶ 22(B)).  Petitioner raised this claim on direct appeal.  *See* Pet'r App. Br. at 27-32, Resp't Ex. B.  The Appellate Division held that C.P.L. § 330.30(1) "was an improper vehicle" to assert the claims in the motion as they were based on matters outside the record.  *Williams*, 150 A.D.3d at 1685.  The Appellate Division found that the trial court properly denied the motion without a hearing. *Id.*

#### 2.  Merits

"Section 2254 authorizes a federal court to grant a writ only where a state holds a petitioner in its custody in violation of 'the Constitution or laws or treaties of the United

States.'" *Word v. Lord*, 648 F.3d 129, 131 (2d Cir. 2011) (per curiam) (quoting U.S.C. §

2254(a)).  "As the Supreme Court has recognized, the Constitution does not compel states

to provide post-conviction proceedings for relief." *Id*.  In *Word*, the Second Circuit held

that "alleged errors in a postconviction proceeding are not grounds for § 2254 review

because federal law does not require states to provide a post-conviction mechanism for

seeking relief." *Id.* at 132 (collecting circuit authority); *see also*, *e.g.*, *Smalls v. Bradt*, No.

11-CV-0915 MAT, 2012 WL 3722222, at *10 (W.D.N.Y. Aug. 27, 2012) (dismissing, as

not cognizable on federal habeas review, the petitioner's claim that the trial court erred in

denying his C.P.L. § 330.30 motion without conducting a hearing because it did "not

implicate federal law").  Petitioner's claim that the trial court erroneously denied his 330

motion without a hearing does not set forth a viable constitutional claim.  Accordingly,

claim six is dismissed as not cognizable on habeas review.

### E.  Suggestive Identification Procedure (Claim Seven)

#### 1.  Background

Petitioner contends that the identification evidence was the product of unduly

suggestive photo arrays.  (Dkt. 1 at 7 ¶ 22(B)).  On direct appeal, Petitioner argued that his

photograph stood out from the filler photographs in both arrays because his hair was

"longer and more afro-like," his "facial hair [was] noticeably longer or fuller also," and his

facial expression was "almost angry, fiery, or even hostile."  Pet'r App. Br. at 35-36, Resp't

Ex. B.  The Appellate Division held Petitioner had only partially preserved the claim for

appellate review, "inasmuch as he did not preserve . . . his contention regarding his

allegedly 'hostile' facial characteristics or expressions."  *Williams*, 150 A.D.3d at 1685-

86.  In any event, the Appellate Division concluded that the suggestive identification claim, as a whole, "lack[ed] merit" because the photo arrays "did not create a substantial likelihood that the defendant would be singled out for identification." *Id.* (internal quotation marks omitted).

Given the Appellate Division's determination that the claim was not preserved for appellate review, the Court infers that it relied on New York State's contemporaneous objection rule, codified at C.P.L. § 470.05(2).  Habeas courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  However, procedural default based on the adequate and independent state ground doctrine is an affirmative defense that must be asserted by the state.  *Gray v. Netherland,* 518 U.S. 152, 165-66 (1996).

Here, Respondent did not raise the affirmative defense of procedural default as to the "hostile facial expression" aspect of the suggestive identification claim and, instead, addressed the entire claim on the merits.  Consequently, Respondent has waived the affirmative defense of procedural default, and there is no impediment to this Court reviewing the unpreserved claim.  *Sutton v. Graham*, No. 11-CV-06532 MAT, 2012 WL 4103884, at *7 (W.D.N.Y. Sept. 17, 2012) (collecting cases).

The Appellate Division's holding that the suggestive identification claim "lack[ed] merit," *Williams*, 158 A.D.3d at 1685-86, encompassed the unpreserved "hostile facial expression" argument as well as the arguments preserved at the *Wade* hearing.  The unpreserved argument therefore was adjudicated on the merits along with the preserved

arguments, and they all are subject to the deferential standards set forth in 28 U.S.C. § 2254(d). *See Tatum v. Lempke*, 481 F. App'x 659, 662 n.4 (2d Cir. 2012) (noting that where the state court found a "claim to be procedurally barred but also addressed its merits," the federal habeas court "must afford AEDPA deference" to the "state court's alternative holding on the merits," rather than review the petitioner's claim *de novo*).

### 2. Merits

The "clearly established [f]ederal law," 28 U.S.C. § 2254(d)(1), at issue here "is a fairly permissive standard—whether an identification was 'unnecessarily suggestive,'" *Brisco v. Ercole*, 565 F.3d 80, 90 (2d Cir. 2009) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)), "and created a 'a very substantial likelihood of irreparable misidentification,'" *id.* (quoting *Simmons United States*, 390 U.S. 377, 384 (1968)). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

"[T]he question of whether an out-of-court identification procedure is so suggestive that it violates a defendant's due process rights is a mixed question of law and fact." *Sanford v. Burge*, 334 F. Supp. 2d 289, 301 (E.D.N.Y. 2004) (citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982)). "[T]he findings of fact which underlie the state court's conclusion are entitled to the statutory presumption of correctness," and "[u]nless rebutted by clear and convincing evidence, the habeas court must accept the facts found by the state court as true." *Id.* (citing 28 U.S.C. § 2254(e)(1); *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir. 2002); *Sumner*, 455 U.S. at 597 & n.10).

Where, as here, "the number of photographs shown has not been so small as to make the presentation itself unfairly suggestive," *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (citing, *inter alia*, *United States v. Bennett*, 409 F.2d 888, 898 (2d Cir. 1969) (six-photograph array not impermissibly suggestive)), "and there is nothing suggestive in the officials' manner of presentation, the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit,'" *id.* (alteration in original) (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984)).

The trial court made detailed findings of fact regarding the compositions of both photo arrays and each individual photograph in the arrays. (*See* H: 80-82). The trial court concluded that they all had similar facial characteristics and hairstyles. (*See id.*) Petitioner has not come forward with any evidence, let alone clear and convincing proof, that these findings were incorrect. Therefore, Petitioner has not rebutted the presumption of correctness that must be accorded to the trial court's detailed factual findings, *see* 28 U.S.C. § 2254(e)(1).

"The Supreme Court has yet to explain how these [§ 2254(e)(1) and (d)(2)] interact." *Cardoza v. Rock*, 731 F.3d 169, 178 n.5 (2d Cir. 2013). To the extent that 28 U.S.C. § 2254(d)(2) also applies to the trial court's factual determinations, the Court has reviewed the photographic arrays and finds that the trial court accurately described the very minor physical differences among the subjects' photos. "Even if there are some physical differences, a photo-array or line-up will not be suggestive so long as the other pictures or

stand-ins sufficiently resembled the defendant to allay any concern that the witnesses might have been unfairly influenced in their selection of him by any of the noted physical differences between him and the others.'" *Echevarria-Perez*, 779 F. Supp. 2d at 335 (quoting *Gossett v. Henderson*, 87 Civ. 5878(CSH), 1991 WL 135601, at *2 (S.D.N.Y. July 18, 1991)). The trial court's decision that the filler photos and Petitioner's photo were sufficiently similar to allay any due process concerns did not "result[] in an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2), at the *Wade* hearing.

The Appellate Division did not revisit the trial court's factual findings regarding the composition of the photographic arrays but simply concluded that the arrays did not create a substantial likelihood that Petitioner would be singled out for identification. *Williams*, 150 A.D.3d at 1685-86. Notably, "due process does not require that 'all of the photographs in the array be uniform with respect to a given characteristic.'" *Robinson v. Conway*, No. 05-CV-0542 VEB, 2010 WL 3894989, at *3 (W.D.N.Y. Sept. 30, 2010) (quoting *Jarrett*, 802 F.2d at 41); *see also Echevarria-Perez*, 779 F. Supp. 2d at 335 ("To defeat a charge of suggestiveness, the government is not required to show that the other pictured individuals or stand-ins have physical features nearly identical to those of the defendant." (quoting *United States v. Padilla*, 94-CR-313, 1994 WL 681812, at *6 (S.D.N.Y. Dec. 5, 1994)); *Tavarez v. Le Fevre*, 649 F. Supp. 526, 530 (S.D.N.Y. 1986) ("There is no requirement that a suspect in a lineup be surrounded by people identical in appearance.")). The Appellate Division accordingly did not unreasonably apply, or rule in manner contrary to, clearly

established Supreme Court precedent regarding the due process requirements in connection with identification procedures.  Claim seven does not entitle Petitioner to habeas relief.

### F.  Unduly Harsh and Severe Sentence (Claim Eight)

#### 1.  Background

Petitioner complains that his sentence was unduly harsh and severe.  (Dkt. 1 at 7 ¶ 22(B)).  Petitioner raised this claim on direct appeal, arguing that the trial court abused its sentencing discretion in light of his lack of prior felony convictions, his status as the father of two young children, and his interest in furthering his education.  *See* Pet'r App. Br. at 47-51, Resp't Ex. B.  Petitioner asked the Appellate Division to exercise its statutory authority to reduce sentences in the interest of justice.  *See id.* at 48 (citing N.Y. Crim. Proc. Law § 470.15(6)(b)).  The Appellate Division declined to do so, finding that "the sentence is not unduly harsh or severe."  *Williams*, 150 A.D.3d at 1686.

#### 2.  Merits

"A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court."  *Echevarria-Perez*, 779 F. Supp. 2d at 337-38 (citing *Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir. 1977) (holding that the petitioner did not raise a cognizable federal claim by seeking to prove that the state judge abused his sentencing discretion in disregarding his psychiatric reports)).

As Petitioner conceded on appeal, the trial court had the authority to sentence him to a minimum determinate term of five years in prison and a maximum determinate term of twenty-five years in prison on the first-degree robbery convictions.  *See* Pet'r App. Br. at 47-48, Resp't Ex. A.  Instead, the trial court imposed determinate terms of fifteen,

thirteen, eleven, and ten years on counts two, three, four, and five, respectively.  *Id.*  "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam). Accordingly, claim eight is dismissed as not cognizable on federal habeas review.

### G. Failure to Disqualify Prosecutor Due to Conflict of Interest (Claim Nine)

#### 1. Background

Petitioner faults the prosecutor for failing to inform the jury about his conflict of interest stemming from his involvement in prior prosecutions of Petitioner.  (Dkt. 1 at 7 ¶ 22(C)).  Petitioner raised this allegation in the 440 motion, arguing that the prosecutor should have been disqualified.  *See* 440 Motion at 8(B), Resp't Ex. D.  The 440 court rejected this claim on the merits, finding no authority for the proposition that a defendant is entitled to a prosecutor who is unfamiliar with his criminal history.  *See* 440 Order at 5, Resp't Ex. D.

#### 2. Exhaustion and Procedural Default

For the reasons discussed above in Section V.A.2, the Court bypasses the exhaustion and procedural default issues raised by Petitioner's failure to seek leave to appeal the denial of the 440 motion and proceeds to the merits of the prosecutorial-disqualification claim.

#### 3. Merits

Petitioner has not cited any constitutional provisions or other legal authority for his disqualification claim.  The Court interprets the *pro se* petition broadly to assert that the prosecutor's handling of Petitioner's case deprived him of the due process right to a fundamentally fair trial because the prosecutor previously had prosecuted Petitioner in an

unrepresented criminal matter.  Petitioner contends that the trial court should have ordered the prosecutor's disqualification.

It is axiomatic that a federal court's "review of states' attorneys' conduct is limited to due process and does not involve the [federal] [c]ourt's supervisory powers." *Malley v. Manson*, 547 F.2d 25, 28 (2d Cir. 1976) (citing *Donnelly v. De Christoforo*, 416 U.S. 637, 642 (1974) (a federal court's of a state prosecutor's conduct is "the narrow one of due process, and not the broad exercise of supervisory power that it would possess in regard to its own trial court") (internal quotation marks and citation omitted)).  Likewise, "federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts," *Daye v. Att'y Gen. of State of N.Y.*, 712 F.2d 1566, 1571 (2d Cir. 1983), but they "lack such authority with respect to state courts," *id.*; *see also Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.").

Thus, "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'"  *Donnelly*, 416 U.S. at 642 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)).  The question is not whether the trial court's or the prosecutor's conduct violated federal standards of judicial or prosecutorial propriety but whether their conduct "exceed[ed] constitutional limits." *Daye*, 712 F.2d at 1571.

The difference in approaches is illustrated by *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987).  There, the federal district court appointed private attorneys as special prosecutors in a criminal contempt prosecution for aiding and abetting violations of a permanent injunction prohibiting infringement of a manufacturer's trademark; those private attorneys were the same attorneys who represented the trademark holders in the civil action.  *See id.* at 790-92.  The defendants argued that the appointment of these attorneys violated their right to be prosecuted only by an impartial prosecutor and required reversal of their contempt convictions.  *Id.* at 793.  The Second Circuit held that the trial court acted within its discretion in appointing the trademark holders' attorneys.  *Id.* at 792.  In a plurality opinion, the Supreme Court reversed the contemnors' convictions.  *Id.* at 809, 814.  Though a plurality of the justices concluded that the appointment of a private prosecutor was structural error not subject to harmless error analysis, three justices specifically disagreed that the appointment of an interested prosecutor amounted to structural error.  *Webber v. Scott*, 390 F.3d 1169, 1176 n.3 (10th Cir. 2004).

Significantly, the Supreme Court emphasized that its decision was not based upon the Constitution or federal law but instead was based on its supervisory authority over the federal courts.  *See id.* at 790 ("We now reverse, exercising our supervisory power. . . ."); *id.* at 802 ("[W]e hold, in the exercise of our supervisory power. . . ."); *id.* at 809 ("The exercise of supervisory authority is especially appropriate in the determination of the procedures to be employed by courts to enforce their orders, a subject that directly concerns the functioning of the Judiciary.  We rely today on that [supervisory] authority. . . ."); *id.* at 809 n.21 ("[W]e rely on our supervisory authority to avoid the necessity of reaching any

constitutional issues."); *id.* at 826 (Powell, J., concurring in part) ("Here, the error is not of constitutional dimension."); *see also East v. Scott*, 55 F.3d 996, 1000 n.2 (5th Cir. 1995) ("*Young* was decided under the [Supreme] Court's supervisory power over federal courts, not as a matter of federal constitutional law."); *Webber*, 390 F.3d at 1176 n.3 (same).

Even if Petitioner relied on *Young*, which he did not, it does not assist his attempt to obtain a writ of habeas corpus because it did not rely on federal constitutional principles. It is well settled that federal courts sitting in habeas corpus are concerned only with whether the conviction violated the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); *see also Daye*, 712 F.2d at 1571 ("The only commands that federal courts can enforce in state courts are those of the Constitution.").

This Court has found no authority in this Circuit or other circuits for applying *Young* to a habeas corpus proceeding.  Indeed, the Second Circuit has rejected a state prisoner's attempt to rely on *Young* in a § 2254 proceeding.  *See Sassower v. Sheriff of Westchester Cnty.*, 824 F.2d 184, 191 (2d Cir. 1987) (denying petitioner's § 2254 petition and finding that *Young* did "not control [his] state court contempt proceeding" because, in that case, the Supreme Court had "exercised its supervisory power over federal prosecutions in the federal courts" and did not decide a constitutional question).

To the extent Petitioner argues that the prosecutor should have been disqualified and a special prosecutor appointed pursuant to N.Y. County Law § 701(1), he at most raises an alleged misapplication of state law.  County Law § 701(1) "allows a court to appoint a special district attorney where the elected district attorney is disqualified from acting," but "this statute is narrow," and should only be utilized "in exceptional circumstances." *People*

*v. Castaldo*, 48 Misc. 3d 996, 1008 (N.Y. Sup. Ct. 2015) (citing *People v. Leahy*, 72 N.Y.2d 510, 513-14 (1988)).  "As a general rule, courts 'should remove a public prosecutor only to protect a defendant from actual prejudice arising from a demonstrated conflict of interest or a substantial risk of an abuse of confidence.'"  *People v. Keeton*, 74 N.Y.2d 903, 904 (1989) (quoting *Matter of Schumer v. Holtzman*, 60 N.Y.2d 46, 55 (1983)).

Under New York State's "conflict of interest standard, more than an appearance of impropriety is required; actual prejudice must be shown or, at least, so substantial a risk of actual prejudice that it cannot be ignored."  *Castaldo*, 48 Misc. 3d at 1008.  Thus, "even a previous attorney-client relationship between a defendant and a prosecutor is insufficient to warrant disqualification of a district attorney without a showing of prejudice by the defendant."  *People v. Nelson*, 167 Misc. 2d 665, 673 (N.Y. Crim. Ct. 1995) (collecting cases).

The Court has found no cases in New York State holding that an assistant district attorney's previous prosecution of a defendant, standing alone, creates an inference of impropriety much less gives rise to actual prejudice.  *See, e.g., id.* at 666, 675 (holding that disqualification not required because prosecution of defendant by district attorney who had unsuccessfully prosecuted defendant in previous highly publicized murder trial did not present substantial risk of abuse of confidence, though after defendant's acquittal in previous trial, district attorney had petitioned Attorney General of United States for investigation which resulted in federal charges against defendant for same conduct).  Even if Petitioner had shown that the trial court should have disqualified the prosecutor under

County Law § 701(1), a misapplication of statute statutory law, standing alone, cannot provide habeas relief.

It does not appear that the Second Circuit has addressed whether it is impermissible for a prosecutor to prosecute a defendant multiple times for unrelated offenses. The Third Circuit has held, in an unpublished opinion, that such an argument is "frivolous." *United States v. Zagami*, 374 F. App'x 295, 297 (3d Cir. 2010) (describing as "frivolous" the argument that the prosecutor's previous prosecution of the defendant in an unrelated matter created a conflict of interest requiring the prosecutor's disqualification; finding "no authority to suggest that a prosecutor must disqualify himself under such circumstances").

Petitioner has adduced no facts suggesting that the prosecutor had a personal interest in the outcome of his trial, such as was present in *Young*, or had conflicting loyalties. He seems to suggest that the prosecutor had a negative view of him based on their previous interactions and wanted the jury to convict him. "Prosecutors need not be entirely 'neutral and detached'". *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 62 (1972)). The prosecutor's personal, subjective beliefs about Petitioner's guilt did not give rise to a conflict of interest. Therefore, claim nine is meritless as a matter of federal law and does not provide a basis for habeas relief.

## H. Conviction Based Upon Perjured or Coerced Testimony (Claim Ten)

### 1. Background

Petitioner asserts that the prosecutor knowingly presented false testimony at trial. (Dkt. 1 at 7 ¶ 22(C)). Petitioner raised this claim in the 440 motion, alleging that Frank's testimony was not "accurately supported by DNA reports" and that Thompson's testimony

was "physically impossible" and "contradict[ed]" by the victims' testimony.  *See* 440 Motion at 7(B), Resp't Ex. D.  Petitioner also claimed that Castro's testimony was not worthy of belief because she clearly informed the prosecution that she did not want to be involved in the case and only testified against Petitioner to avoid being jailed.  *See id.* at 6(B).  The 440 court rejected the claims on the merits.  *See* 440 Order at 4, Resp't Ex. D. The 440 court determined that Petitioner "failed to proffer any evidence beyond unsupported allegations to support his contention" that the prosecutor "suborned perjured testimony."  *Id.*  The 440 court also found that it was "not improper" for the prosecution to issue a grand jury subpoena to an individual who might have information about a crime committed by the target of an investigation.  *Id.*

### 2.  Exhaustion and Procedural Default

For the reasons discussed above in Section V.A.2, the Court bypasses the exhaustion and procedural default issues raised by Petitioner's failure to seek leave to appeal the denial of the 440 motion and proceeds to the merits of the perjury claim.

### 3.  Merits

The prosecution's use of perjured testimony can violate due process, but only where "'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted in original)).  That the "witness actually committed perjury," *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000), is a necessary predicate for a due process claim, *see id.* (holding that "appellants' claim fail[ed] because

they have not established that [the witness] committed perjury"). Federal courts have repeatedly held that "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995). Petitioner has not identified anything more than "[s]imple inaccuracies or inconsistencies" in a witness's recollection or inconsistences between various witnesses testimony, which clearly "do not rise to the level of perjury." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001).

Though Petitioner labels his allegations as violations of the right to due process, the substance of his argument reveals that it is simply a reformulated "weight of the evidence" claim. The allegations of perjury by Castro, Frank, and Thompson represent nothing more than attacks on their credibility as witnesses and the proper weight to be accorded to their testimony. Defense counsel already made such arguments to the jury during his summation (TT: 604-07, 608, 615-16), and the jury rejected them. This Court, sitting in habeas review, cannot "revisit the factfinder's determinations as to the witnesses' credibility and veracity." *Moye v. Corcoran*, 668 F. Supp. 2d 523, 539 (W.D.N.Y. 2009) (citing *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981)); *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) ("[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."). Not only are Petitioner's allegations that the prosecutor suborned perjury factually baseless, as the 440 court found, they also do not state a colorable due process violation. Accordingly, claim ten does not provide a basis for habeas relief.

## VI.    <u>CONCLUSION</u>

For the reasons above, the petition (Dkt. 1) is denied.  The Court declines to issue a certificate of appealability under 28 U.S.C. § 2253(c)(1) because Petitioner has failed to make "a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2).  The Clerk of Court is directed to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:       December 28, 2023
             Rochester, New York